# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Charles P. Kocoras | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 00 C 49 | **DATE** | 5/4/2000 |
| **CASE TITLE** | | SEC vs. Park et al | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ■ Status hearing set for 9/6/2000 at 9:30 A.M..

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Ruling held. **ENTER MEMORANDUM OPINION:** The Court denies Defendants' motion (Doc 14-1) to dismiss. Defendants are given to May 25, 2000 to answer the complaint. All fact discovery to be completed by September 6, 2000.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | MAY 0 5 2000 | |
| ✓ | Docketing to mail notices. | date docketed | 20 |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | docketing deputy initials | |
| SCT | courtroom deputy's initials | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 00 C 0049 |
| GUN SOO OH PARK, A/K/A TOKYO JOE, and TOKYO JOE'S SOCIETE ANONYME CORP., | ) ) ) ) | |
| Defendants. | ) | |

DOCKETED
MAY 0 5 2000

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This matter comes before the Court on Defendants' motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). For the reasons set forth below, the Court denies Defendants' motion to dismiss.

## BACKGROUND

Plaintiff, the United States Securities Exchange Commission (the "SEC"), filed a four count complaint against Defendants Yun Soo Oh Park, a.k.a. Tokyo Joe ("Park"), and Tokyo Joe's Societe Anonyme Corp. (collectively, the "Defendants"), as a result of Defendants' conduct on their web site, which allegedly violates various

SEC regulations. For the purposes of this motion, the Court is obligated to assume the truth of the facts alleged in the SEC's complaint.

The allegations of the complaint include the following. On or about April 6, 1998, Park incorporated Societe Anonyme Corp. as a New York corporation. Park is the sole officer and shareholder and operated the corporation from his home in New York. On or about July 23, 1999, Societe Anonyme Corp. changed its name to Tokyo Joe's Societe Anonyme Corp. (hereinafter "Societe Anonyme"). Neither of these corporations ever registered with the SEC in any manner.

In 1997, Park began posting messages on various public financial Internet bulletin boards, which allow people to electronically post and reply to messages regarding stocks, investing, and other financial subjects. During 1998, Park posted thousands of messages under the names "Tokyo Joe" or "TokyoMex." In early 1998, individuals from these bulletin boards began directly contacting Park, soliciting further information about stock picks and trading. As a result, in March 1998, Park created an e-mail list and sent individuals on the list his stock picks. In April 1998, Park established an Internet web site called Tokyo Joe's Café, from which people could receive e-mail alerts regarding Park's stock picks for a fee of

$29 per month. This web site operated until late June or early July 1998, and Park never collected any fees in connection with this site.

In or about July 1998, Park set up Tokyo Joe's, another Internet site, at tokyojoe.com, which continues to operate under Park's control. From about July 1998 to about December 1998, Tokyo Joe's consisted of two areas. One was a limited area of the web site accessible to the general public, and the other consisted of a more expanded area of the web site accessible only to fee paying members. From about July 1998 to about November 1998, the fee was $299 per year to become a Societe Anonyme member. Members receive, among other things, exclusive e-mails of Park's daily stock picks and unlimited access to the members-only areas of Park's web site. In November 1998, the fee structure changed so that new members paid either $249 for six months or $49 per month to become members. In or about December 1998, Park added a "chat room" to the members-only area of the web site. The chat room serves as a forum in which Park conducts two-way electronic dialogues with Societe Anonyme members about Park's stock picks and other investment advice. In January 1999, Park increased the membership fee, which covered the access to the chat room, to $100 per month. Between July 1998 and May 1999, Societe Anonyme's membership increased from about 200 to

3,800 subscribers. In or about June 1999, Park again revised Societe Anonyme's fee structure so that new or renewing members paid $100 per month, but in addition had to pay another $100 per month to access the interactive chat room. According to the SEC, Park collected over $1.1 million dollars in Societe Anonyme membership fees.

Through the web site, Park e-mails, posts, and discusses various stock picks, reactions to the day's markets, and trading tips. He updates the information on his web site at irregular intervals throughout the day. Generally, Park first composes and sends e-mail alerts about his stock picks and also posts them on the members-only portion of the web site. Then, Park discusses his stock picks in the members-only chat room, after which Park may post some of his picks on the public portion of his web site, which is accessible to all Internet users. Finally, Park often posts his picks on public Internet bulletin boards.

Through his advice to the thousands of members on his web site, the SEC alleges that Park was essentially able to manipulate and affect the price of stocks he would buy and sell. For example, he would purportedly encourage members to buy shares of certain stocks, which he also already owned, in order to inflate the price, and then he would reap the benefit by selling his shares profitably, a practice known

as scalping. Thus, often, Park would be selling the same stock he was advising his members to purchase. In addition, Park would often recommend holding a stock for several days, claiming that it would hit a target price, while Park was meanwhile immediately selling his stock or placing limit orders below his expressed target price. In order to convince investors to follow his advice, Park would allegedly post effusive testimonials and false and misleading performance results. Park would also misrepresent that Societe Anonyme was buying a certain stock when it in fact already owned the stock or was selling it. Moreover, Park never revealed any of his true interests in the stocks he was recommending to his members to buy and sell. The SEC also claims that Park "touted" the stock of a certain company in exchange for receipt of stock or other compensation from that company.

As a result of Defendants' activities on the web site, the SEC filed four counts. Count I alleges a violation of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder. Count II claims a violation of §17(b) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §77q(b). The SEC alleges in Count III violations of §206(1) of the Investment Advisers Act of 1940 (the "Advisers Act"),

15 U.S.C. §88b-6(1). Finally, in Count IV, the SEC alleges violations of §206(2) of the Advisers Act, 15 U.S.C. §80b-6(2).

Defendants moves to dismiss the SEC's complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b). Specifically, Defendants move to dismiss Counts III and IV, claiming that they are not subject to the Advisers Act because Defendants did not provide "personalized" investment advice. Further, Defendants argue that through its claims in Counts III and IV, the SEC is attempting to regulate Defendants' editorial content regarding investing in violation of Defendants' First Amendment rights. Defendants also move to dismiss Count I, arguing that the SEC's allegations that Defendants failed to disclose material information to subscribers does not state a claim because Defendants did not have a duty to disclose the alleged information. In addition, Defendants move to dismiss the SEC's complaint in its entirety for failing to meet the requirements of Rule 9(b). According to Park, all the SEC's claims are grounded in or sound in fraud, and must therefore be plead with particularity as required by Rule 9(b).

## LEGAL STANDARD

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the sufficiency of the complaint, not to decide the merits of the case. A defendant must

meet a high standard in order to have a complaint dismissed for failure to state a claim upon which relief may be granted. In ruling on a motion to dismiss, the court must construe the complaint's allegations in the light most favorable to the plaintiff and all well-pleaded facts and allegations in the plaintiff's complaint must be taken as true. Bontkowski v. First Nat'l Bank of Cicero, 998 F.2d 459, 461 (7th Cir. 1993), cert. denied, 510 U.S. 1012, 114 S.Ct. 602, 126 L.Ed.2d 567 (1993). The allegations of a complaint should not be dismissed for failure to state a claim "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nonetheless, in order to withstand a motion to dismiss, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action. Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992), cert. denied, 506 U.S. 893, 113 S.Ct. 267, 121 L.Ed.2d 196 (1992).

In reviewing a Rule 12(b)(6) motion to dismiss for failure to state a claim, the court is limited to the allegations contained in the pleadings themselves. Documents incorporated by reference into the pleadings and documents attached to the pleading as exhibits are considered part of the pleadings for all purposes. See Fed. R. Civ. P. 10(c). In addition, "documents that a defendant attaches to a motion to dismiss

are considered a part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." <u>Venture Associates Corp. v. Zenith Data Systems Corp.</u>, 987 F.2d 429, 431 (7th Cir. 1993). With these principles in mind, the Court evaluates Defendants' motion.

## DISCUSSION

### I. Counts III and IV

Defendants move to dismiss Count III and IV, arguing that the Advisers Act does not apply to them because they are not "investment advisers" thereunder since they never rendered any personalized investment advice. Defendants also argue that application of the Advisers Act to Defendants' activities would violate the First Amendment. The Court will address each of these arguments in turn.

### A. Applicability of the Advisers Act

The SEC brings Counts III and IV against Defendants under the Advisers Act, claiming that Park and Societe Anonyme are "investment advisers" thereunder, while Defendants argue that the Advisers Act is inapplicable to them because they do not meet the definition of "investment advisers." The Advisers Act provides, in relevant part:

> "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through

publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities; but does not include ... (D) the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation.... 15 U.S.C. §80b-2(a)(11)

Both parties rely primarily on the United States Supreme Court's decision in Lowe v. Securities and Exchange Commission, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985), to support their understanding of who constitutes an "investment adviser" and is thus subject to the Advisers Act. Defendants argue that Lowe established that an individual must be engaged in the dispensing of personalized investment advice in order to be considered an "investment adviser." The SEC, on the other hand, contends that Lowe defined investment advisers according to the basic definition set out in §80b-2(a)(11) above, and then looked to the specific exclusion for publishers to conclude that the Advisers Act did not apply to the defendant in Lowe. According to the SEC, because Defendants, unlike the defendant in Lowe, do not fall within the exclusion for publishers, they qualify as "investment advisers" under the Advisers Act. The Court finds that the correct understanding of what constitutes an "investment adviser" is somewhere in between those advanced by the parties.

The Supreme Court looked to the legislative history as well as the language of the statute to determine the definition of "investment adviser." The court recognized that Congress was "primarily interested in regulating the business of rendering personalized investment advice, including publishing activities that are a normal incident thereto." Id. at 204, 105 S.Ct. at 2570. At the same time, Congress was cognizant of the First Amendment concerns raised in regulating such publications and thus wanted to make clear that "it did not seek to regulate the press through the licensing of nonpersonalized publishing activities." Id. Thus, the definition of "investment adviser" provides exclusions to sort out those not engaged in giving personalized investment advice. The publishers exclusion broadly excludes "the publisher of any bona fide newspaper, news magazine or business or financial publication of general and regular circulation" from the category of investment advisers. See id. at 206, 105 S.Ct. at 2571; 15. U.S.C. §80b-2(a)(11)(D).

Thus, in defining "investment advisers," the statute seems to first set out a basic definition that describes those involved in the "business of rendering personalized investment advice, including publishing activities that are a normal incident thereto." Id. at 204, 105 S.Ct. at 2570. It then excludes those that it

considers as not engaged in this personalized activity by providing certain exclusions, among them, the publishers exclusion. See 15. U.S.C. §80b-2(a)(11). Thus, Defendants are correct in that the personalized nature of one's publications is crucial in determining whether one is an investment adviser. However, whether or not a publication is personalized for purposes of the Advisers Act is determined in large part by whether or not the publication can fall into an exclusion for nonpersonalized or general publications. The Supreme Court in Lowe did not merely look to see whether Lowe's newsletters provided individualized advice to its audience. Rather, the court engaged in an analysis of the publishers exclusion and determined that Lowe's newsletters were "bona fide" publications that had "general and regular" circulation in order to exclude Lowe from the definition of investment advisers. See id. at 208-09, 105 S.Ct. 2572. The Court then commented that it was consistent with Congress' intentions that the type of non-individualized advice in Lowe's newsletters find shelter in the publishers exclusion for general, non-personalized publications.

In Lowe, the SEC sought to enjoin certain newsletters published by Lowe that allegedly violated the Advisers Act because Lowe was not properly registered thereunder. See Lowe, 472 U.S. at 181, 105 S.Ct. at 2558. Individuals paid a fee

to subscribe to Lowe's purportedly semimonthly newsletters, which contained investment advice and commentary. The Supreme Court held that Lowe was not subject to the Advisers Act because his publications fell within the statutory exclusion for bona fide publishers, and thus, he was not an "investment adviser." See id.

In determining that Lowe fell within the publishers exclusion, the Supreme Court determined that Lowe's newsletters were "bona fide" and had a "general and regular" circulation. See Lowe, at 206, 105 S.Ct. at 2571. Although the Advisers Act does not define either term, the court found that:

> presumably a 'bona fide' publication would be genuine in the sense that it would contain disinterested commentary and analysis as opposed to promotional material disseminated by a 'tout.' Moreover, publications with a 'general and regular' circulation would not include 'people who send out bulletins from time to time on the advisability of buying and selling stocks. Id.

The personalized or disinterested nature of a publication clearly to affects whether or not that publication is a "bona fide" one. The court held that Lowe's publications were "bona fide" because "they are published by those engaged solely in the publishing business and are not personal communications masquerading in the clothing of newspapers, news magazines, or financial publications. Moreover, there is no suggestion that they contained false or misleading information, or that they

were designed to tout any security in which petitioners had an interest." Id. at 209, 105 S.Ct. at 2572. This understanding of "bona fide" is consistent with Congress' intentions that those that publish nonpersonalized publications be excluded from the definition of investment advisers.

In the instant case, Defendants' argument that they did not provide personalized services because they did not tell subscribers on an individualized basis to buy, sell, or hold securities is not enough to exclude Defendants from the category of "investment advisers." Rather, the Court looks to the publishers exception to determine whether Defendants' publications truly are of the nonpersonalized nature intended to be protected by the Advisers Act. Because the SEC has alleged the existence of facts which could demonstrate that Defendants' do not fall within the publishers exclusion, but instead are "investment advisers," the Court will not presently find that Defendants are not "investment advisers" subject to suit under the Advisers Act.

The Court notes initially that Defendants meet the basic definition of an "investment adviser" in that over the Internet they "for compensation, engag[e] in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or

selling securities, or who, for compensation and as part of a regular business, issu[e] or promulgat[e] analyses or reports concerning securities." 15 U.S.C. §80b-2(a)(11); cf. Lowe, 472 U.S. at 203-04, 105 S.Ct. 2569. Thus, Defendants must fall within an exclusion in order to not be considered an "investment adviser." Moreover, in order to avail themselves of the publishers exception, Defendants' publications over the Internet web site must be both "bona fide" and have a "general and regular" circulation. See id. at 206, 105 S.Ct. at 2571. The SEC has alleged that Defendants' publications are neither.

Defendants' publications may not be "bona fide" or of "general and regular" circulation. As discussed above, a "bona fide" publication is one that is genuine in that it would contain disinterested commentary and analysis and not be promotional material disseminated by a "tout." See id. The SEC has alleged that Defendants' publications were not disinterested. On the web site, Defendants persuaded subscribers to purchase, sell, or hold specific stocks using several methods, including posting effusive testimonials and misleading performance results, urging subscribers to hold stocks until they reached certain target numbers, and falsely stating Societe Anonyme's intentions to purchase certain stocks. Further, the SEC maintains that in certain instances, Defendants were acting as "touts," by promoting

stocks in which they either had an interest or for which they were being paid to recommend without revealing their interests.

Moreover, although Defendants claim that they never provided individualized advice to any clients, it is unclear whether they provided advice that may be viewed as personalized for purposes of the Advisers Act. Defendants allegedly sent e-mails directly to individual e-mail accounts, advising subscribers individually through their e-mail accounts of stock picks. In addition, on the web site, Defendants answered individual questions posited by subscribers in Defendants' chat room.

In arguing that their publications were not personalized, Defendants make much of the fact that they disseminated their advice without tailoring it to the particular needs of each subscriber. For example, Defendants argue that they discussed Park's stock picks in the chat rooms as opposed to the subscriber's picks. Nevertheless, Defendants fail to recognize that often Park's picks may have become or are the subscriber's picks. However, even if it were true that Defendants advice was not tailored to a subscriber's specific needs, it would not make Defendants' publications any more "bona fide." Also, it remains to be seen whether Defendants were not tailoring their advice to the needs of a certain category of individuals who would subscribe to an Internet stock picking web site as opposed to the general

public. Thus, Defendants' publications may be Internet versions of precisely what the publications in Lowe were not–"personal communications masquerading in the clothing of newspapers, news magazines, or financial publications." See id. at 209, 105 S.Ct. at 2572.

Defendants' publications may also not have a "general and regular" circulation. In Lowe, the Supreme Court found that a publication with a "general and regular" circulation would not include "people who send out bulletins from time to time on the advisability of buying and selling stocks." Id. at 206, 105 S.Ct. 2571. Also, the court found that a "regular" circulation, more importantly, would not be "timed to specific market activity, or to events affecting or having the ability to affect the securities industry." Id. at 209, 105 S.Ct. at 2572. Defendants claim that they posted stock picks and information regularly throughout the business day. Although Defendants may have made postings on a daily basis, it is unclear whether Defendants did not time their advice to "specific market activity, or to events affecting or having the ability to affect the securities industry." Id. The SEC has alleged that Defendants sporadically disseminated their advice each day so as to take advantage of certain prices and inflate them or to sell or purchase their own shares

of a particular stock profitably. If those allegations prove to be true, there will not be anything "general and regular" about the Defendants' publications.

## B. First Amendment Infringement Due to Application of Advisers Act

Defendants argue that application of the anti-fraud provision of the Advisers Act to Defendants would impermissibly limit their speech in violation of the First Amendment. Defendants base their argument on the Seventh Circuit's opinion in Commodity Trend Service, Inc. v. Commodity Futures Trading Commission, 149 F.3d 679 (7th Cir. 1998), and the Northern District of Illinois' opinion on remand of that case, Commodity Trend Service, Inc. v. Commodity Futures Trading Commission, No. 97 C 2362, 1999 WL 965962 (N.D. Ill. Sept. 29, 1999) [hereinafter Commodity Trend II]. Defendants arrive at their argument in a convoluted fashion by first claiming that the registration requirement of the Advisers Act is unconstitutional, and then concluding that this renders the application of the anti-fraud provision of the Advisers Act unconstitutional as well.

Defendants, in relying on the Commodity Trend opinions, which interpreted the Commodity Exchange Act (the "CEA"), fail to distinguish the differences between the CEA and the Advisers Act and between the registration requirement and the anti-fraud provision and thus arrive at an incongruous conclusion. In

_Commodity Trend_, the Commodity Futures Trading Commission (the "CFTC") was seeking to enforce a CEA registration requirement against Commodity Trend Service, Inc., a corporation engaged in the business of financial publishing. _See_ _Commodity Trend II_, 1999 WL 965962, at *1. It was undisputed that Commodity Trend fell into the definition of a "commodity trading advisor" under the CEA. _See_ _id_. at *5. Commodity Trend argued that the CEA's registration requirement was both unconstitutional as-applied and overbroad on its face. _See id_. Initially, a district court dismissed Commodity Trend's facial challenge as unripe, finding that the expression chilled by the CEA registration requirement was "concededly" commercial speech; the court also noted that a facial overbreadth challenge could not be brought to redress allegedly unconstitutional restrains on commercial speech. _See_ _Commodity Trend_, 149 F.3d at 683; _Commodity Trend Serv., Inc. v._ _Commodity Futures Trading Commission_, No. 97 C 2362, 1997 WL 452399 (N.D. Ill. July 31, 1997). The Seventh Circuit then reversed and remanded the case, finding that Commodity Trend's publications did not constitute commercial speech and that the First Amendment issue was ripe and justiciable. _See_ _Commodity_ _Trend_, 149 F.3d at 684, 686, 689. On remand, the district court concluded that the registration requirement constituted a prior restraint on speech that violated the First

Amendment.  See Commodity Trend II, 1999 WL 965962.  Also, on remand, the district court considered the enforcement of a subpoena in an investigation of Commodity Trend for violations of the anti-fraud provision of the CEA.  See id. at *14.  Commodity Trend argued that the unconstitutionality of the registration provision made the application of the anti-fraud provisions unconstitutional as well.  The court rejected this argument, finding that the unconstitutionality of the registration requirement did not render the anti-fraud provisions unconstitutional as well.  See id. at *15.

In Commodity Trend II, the court looked to Lowe and recognized that a majority of the Supreme Court, "mindful that it should not decide a constitutional issue if the case could be resolved on other grounds," decided the case on statutory grounds, finding that the petitioners were not "investment advisers" as defined under the Advisers Act because they fell within the publishers exclusion.  See id. at *6, citing Lowe, 472 U.S. at 211.  Thus, Lowe was not subject to the registration requirement, and the majority never reached the issue of the registration requirement's constitutionality.  See Commodity Trend II, 1999 WL 965962, at *6, citing Lowe, 472 U.S. at 211.

However, unlike in <u>Lowe</u>, it was undisputed in <u>Commodity Trend II</u> that the corporation was a "commodity trading advisor." The court in <u>Commodity Trend II</u>, noted also that, unlike the Advisers Act, Congress did not intend to limit the application of the CEA to "personalized" commodity trading activity. <u>See</u> <u>Commodity Trend II</u>, 1999 WL 965962, at *7. Because the definition of a commodity trading advisor encompassed those who provided impersonal advice, including Commodity Trend, the court determined that it needed to proceed to examine the constitutionality of the registration requirement. In doing so, the court looked to the concurring opinion in <u>Lowe</u> for guidance.

Three concurring justices in <u>Lowe</u> disagreed with the majority's interpretation of the Advisers Act, finding instead that the legislative history failed to indicate that Congress intended to exclude individuals who offer impersonal investment advice from the definition of "investment adviser." <u>See</u> <u>Commodity Trend II</u>, 1999 WL 965962, at *7, <u>citing</u> <u>Lowe</u>, 472 U.S. at 219. The three justices, not excluding Lowe's impersonal publications through the publishers exclusion, determined that Lowe was an "investment adviser" and proceeded to analyze the constitutionality of the registration requirement. <u>See</u> <u>Commodity Trend II</u>, 1999 WL 965962, at 7, <u>citing</u> <u>Lowe</u>, 472 U.S. at 233; <u>id</u>. at 216, 227. The concurring justices then

concluded that the registration requirement constituted an unconstitutional prior restraint. See Lowe, 472 at 235.

The distinction that Defendants overlook is that, as discussed previously, the majority in Lowe articulated that "investment advisers" under the Advisers Act do not include those that provide nonpersonalized investment advice. Congress, sensitive to First Amendment concerns, specifically excluded those that were engaged in nonpersonalized publishing activities through the publishers exclusion. See Lowe, 472 U.S. at 204, 206, 105 S.Ct. at 2570-71. Thus, in the instant case, if Defendants are deemed "investment advisers," their publications are of the personalized nature, which Congress intended the Advisers Act to regulate. Defendants do not challenge the constitutionality of requiring registration of investment advisers who provide personalized advice. Moreover, Defendants offer no arguments attacking the constitutionality of the anti-fraud provision of the Advisers Act independent of the registration requirement. Accordingly, the Court does not need to engage in its own academic analysis of the anti-fraud provision's constitutionality. Because Defendants entire challenge to the applicability of the Advisers Act's anti-fraud provision is based on the unconstitutionality of its

registration requirement for nonpersonalized publications, Defendants' challenge is without force.

Commodity Trend II makes clear that someone who cannot constitutionally be required to register is not exempt from other provisions of the CEA. See id. at *15. The unconstitutionality of the registration requirement did not render the anti-fraud provisions of the CEA unconstitutional. See id. Instead, the court upheld the constitutionality of the anti-fraud provisions as measures to prevent fraudulent speech. See id.; Virginia State Bd. Of Pharmacy v. Virginia Citizens Consumer Council, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake"). Even the concurring opinion in Lowe, relied upon by the court in Commodity Trend II, explicitly provides that if an "investment adviser" includes people engaged in impersonal publications, the Advisers Act's anti-fraud provision would still be applicable even though the registration requirement would not. See Lowe, 472 U.S. at 236. Moreover, Commodity Trend II did not hold that only commercial speech can be subject to the CEA's anti-fraud provision. Rather, the court merely noted that because the speech at issue was commercial, it could easily be regulated by the anti-fraud provision. See Commodity Trend II, 1999 WL

965962, at 15. Fraudulent speech is simply not entitled to First Amendment protection of any kind. <u>See</u> <u>In re Factor VII or IX Concentrate Blood Products Litigation</u>, 25 F. Supp. 2d 837, 841-842 (N.D. Ill. 1998). Thus, the Advisers Act's anti-fraud provision can validly be applied to "investment advisers."

## II. Failure to State a Claim under §10(b) of the Exchange Act and Rule 10b-5

Defendants argue that the SEC has failed to state a claim under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants argue that with respect to the §10(b) and 10b-5 claims based on omissions of material fact, the SEC must allege some duty to disclose, which it has failed to do. Moreover, Defendants argue that because any misstatements they made were not in connection with the purchase or sale of securities, they cannot be held liable under §10(b) or Rule 10b-5.

### A. Duty to Disclose

In order to state a claim under 10b-5, a claimant must either allege material misstatements or material omissions by a person having a duty to disclose. <u>See</u> <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 474-75, 97 S.Ct. 1292, 1301-02, 51 L.Ed.2d 480 (1977). Although Defendants do not claim that the SEC has not alleged material misstatements, they argue that with respect to the SEC claims which

allege violations based on omissions of material fact, the SEC has failed to allege a duty to disclose.

Fraud liability does not attach for failure to disclose material information unless a party is under the duty to so disclose. See Chiarella v. U.S., 445 U.S. 222, 228, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980). A duty to disclose exists when one party possesses information "that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them." Id. The SEC contends that Defendants had a duty to disclose because they were "investment advisers" and because they were involved in scalping. Although the Advisers Act may impose a duty on an "investment adviser" to disclose his scalping, it is unclear whether this duty extends to disclosures under the Exchange Act. Compare SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 196-97, 84 S.Ct. 275, 285, 11 L.Ed.2d237 (1963) (investment advisers must make full and frank disclosure of practice of trading on the effect of his recommendations), with Dirks v. SEC, 463 U.S. 646, 657, 103 S.Ct. 3255, 3263, 77 L.Ed.2d 911 (1983) (in Rule 10b-5 claim, disclosure-or-refrain duty attaches only when party has legal obligations other than mere duty to comply with the general antifraud proscriptions in the federal securities law). It seems that the duty to disclose under §10(b) and Rule 10b-5 must arise from

a relationship outside securities law.  See <u>Barker v. Henderson, Franklin, Starnes,</u> <u>& Holt</u>, 797 F.2d 490, 496 (7th Cir. 1986) (citations omitted).  Thus, Defendants' status as "investment advisers" would not create a duty to disclose.

However, it is possible that Defendants may have a relationship of trust and confidence with its subscribers so as to impose on them a duty to disclose their scalping activity.  Defendants are unlike the employee in <u>Chiarella</u> who was "a complete stranger who dealt with the sellers only through impersonal market transactions." <u>Chiarella</u>, 445 U.S. at 232-33, 100 S.Ct. at 1117.  Rather, Defendants allegedly had an ongoing relationship with their subscribers and communicated with them electronically on a daily basis.  That Defendants advice and stock picks were sometimes directed at a group and not at the individual does not necessarily mean that the subscribers did not place trust and confidence in Defendants.  Moreover, Defendants did communicate through e-mails to individual accounts and addressed individual questions in the chat room.  Also, subscribers were apparently placing some degree of trust and confidence in Defendants' particular advice since they were willing to pay a not-insubstantial fee for information and services that they could have acquired practically for free through other web sites, cable t.v. programs, and newspapers.

Defendants are like the newspaper columnist in <u>Zweig v. Hearst Corp.</u>, 594 F.2d 1261, 1268 (9th Cir. 1979). Although Defendants claim that <u>Chiarella</u> overruled <u>Zweig</u>, <u>Zweig</u> still seems to be good law. The Supreme Court in <u>Chiarella</u> found that a person who acquires nonpublic material information by virtue of their position in the market is not required to disclose it absent a duty to do so. <u>See</u> <u>Chiarella</u>, 445 U.S. at 228-232, 100 S.Ct. at 114-1116; <u>SEC v. Lipson</u>, No. 97 C 2661, 1998 WL 786456, at *2 (N.D. Ill. Nov. 5, 1998). However, it nowhere held that someone who encourages people to buy certain stocks and who also charges a fee to these people for this advice has no duty to disclose his interest in the stock. In <u>Zweig</u>, a newspaper columnist scalped stocks by praising certain stocks in his columns without revealing that he had invested in the stock at a discount price prior to publishing the article with the intention of selling the stock on the wave of the price increase resulting from his article. <u>See</u> <u>id</u>. at 1264-65. The Ninth Circuit found that although columnists usually did not have a duty to disclose facts about their financial affairs, §10(b) and Rule 10b-5 required disclosure in certain circumstances. <u>See</u> <u>id</u>. at 1268. The court found that the columnist had assumed the duty to disclose when, "with knowledge of the stock's market and an intent to gain personally, he encouraged purchases of the securities in the market."

See id. Thus, a person who intends to engage in scalping assumes a duty to disclose his interest in the targeted stock.

Thus, because the alleged facts may show that Defendants enjoyed a relationship of trust and confidence with their subscribers or may have assumed a duty to disclose their scalping, the SEC has properly alleged its claims based on Defendants omissions.

### B. In Connection with Purchase or Sale of Securities

Defendants argue that the SEC has failed to claim that their allegedly fraudulent statements were in connection with the purchase or sale of securities as required by §10(b) and Rule 10b-5. Defendants contend that because they did not provide personalized investment advice, any representations they made cannot be considered "in connection with the purchase or sale" of a security.

Section 10(b) and Rule 10b-5 prohibits fraud "in connection with the purchase or sale of any security." 17 C.F.R. §240.10b-5(c). The United States Supreme Court has held that this requirement "must be read flexibly, not technically and restrictively." Superintendent of Insurance v. Bankers Life & Casualty Co., 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971), cited with approval by Abrams v. Oppenheimer Gov't Securities, Inc., 737 F.2d 582, 593 (7th Cir. 1984),

and SEC v. Randy, 38 F. Supp.2d 657, 669 (N.D. Ill. 1999). The SEC has alleged facts suggesting that Defendants engaged in fraud "in connection with the purchase or sale of securities." The SEC claims that Defendants disseminated false and misleading information regarding certain stocks to its subscribers in order to inflate prices. The SEC then claims that immediately following Defendants advice, the trading volume on those stocks increased dramatically. These facts support the inference that his false information caused at least some of those to whom Defendants disseminated his false information to make purchases.

Moreover, fraud in the sale of investment advice may qualify as "in connection" with the sale of securities when it is expected that the advisees will act on the advice. See R&W Technical Servs. Ltd. v. CFTC, 205 F.3d 165, 172-73 (5th Cir. 2000). The complaint asserts facts suggesting that Defendants sold their allegedly false and misleading advice to induce their subscribers to purchase or sell certain stocks and that it was expected that some of these subscribers would act on the advice. The subscribers paid Defendants to get advice on what stocks to purchase. Having paid Defendants for that advice, it was expected that the subscribers acted on it.

For these reasons, the SEC has sufficiently alleged that Defendants' fraud was "in connection" with the sale or purchase of a security.

## III. Rule 9(b)

Finally, Defendants argue that because all counts of the SEC's complaint either sound or are grounded in fraud, they must meet the requirements of Rule 9(b). Defendants move to dismiss all claims, alleging that the SEC has not plead their claims with particularity.

Rule 9(b) provides that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). In order to fulfill the requirements of Rule 9(b), a plaintiff must allege the "who, what, when, and where" of the alleged fraud. See Uni*Quality, Inc. v. Infotronix, Inc., 974 F.2d 918, 923 (7th Cir. 1992). Thus a complaint must state "matters such as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation." SEC v. GSC Enterprises, Inc., 469 F. Supp. 907, 911 (N.D. Ill. 1979); accord Bankers Trust Co. v. Old Republic Insurance Co., 959 F.2d 677, 683 (7th Cir. 1992).

The SEC has sufficiently met the requirements of Rule 9(b). It has alleged that Park engaged in a scheme to defraud by giving false and misleading information

and advice to Societe Anonyme members, the subscribers of his Internet web site. The SEC provides that when Park posted his messages on his web site, he simultaneously e-mailed subscribers to notify subscribers via individual e-mail accounts of his advice and stock picks . The SEC provides five specific examples of Park's fraud, detailing the dates on which he made his fraudulent representations on and via his Internet web site and describing Park's fraudulent conduct. One of these examples states:

> 38. For example, on December 11, 1998, Park bought 16,000 shares of The Vialink Company ("Vialink") and 8,000 shares of Vialink warrants. On December 14, Park identified Vialink as his pick of the day and recommended that Societe Anonyme members buy Vialink. Park did not disclose that he already owned shares of Vialink or that he had placed a limit order to sell his shares one minute before issuing his recommendation to buy.
> 39. On December 14, 1998, following Park's recommendation to buy, Vialink volume reached 457,000 shares, up 945% from the average daily volume the week before Park bought his shares. Similarly, Vialink's closing price increased from $7.38 on December 11 to $8.50 on December 14. On December 14, Park profitably sold his entire position in Vialink and the corresponding warrants.

Although the SEC identifies the person making the misrepresentation as Park, Defendants claim that because the SEC only identifies those Defendants defrauded as "subscribers" or "Societe Anonyme members," the SEC has not stated its claims with particularity. However, the "who" the SEC must identify refers to the "person

making the misrepresentation." <u>Bankers Trust</u>, 959 F.2d at 683; <u>Blaz v. Michael</u>
<u>Reese Hospital Foundation</u>, No. 96 C 0091, 1999 WL 1269189, at 4 (N.D. Ill. Dec.
22, 1999). Moreover, it is sufficient to identify those defrauded as subscribers or
Societe Anonyme members as the allegations still "reasonably notify the defendants
of their purported role in the scheme." <u>SEC v. Ogle</u>, No. 99 C 609, 2000 WL
45260, at *6 (N.D. Ill. Jan. 11, 2000); <u>see also</u> <u>Blaz</u>, 1999 WL 1269189, at *4
(institutional identity of unidentified caller sufficient, i.e. that she was from Michael
Reese).

Defendants also claim that with respect to the SEC's claim regarding Park's
alleged false past performance, the SEC must give specific names of stocks, with
regard to which he lied about his past performance. The Court finds that the SEC
has sufficiently alleged Park's false past performance. The SEC alleges that Park
lied about his past performance results from his trading in his recommended stocks.
The SEC claims that beginning in April 1998, Park posted and continuously updated
his past performance figures on the public portion of his web site. His performance
results purportedly reflected Park's up-to-date performance on his recommended
stocks from January 1998. By using the positive performance results, Park recruited
Societe Anonyme members. However, Park inflated his performance results by

using the highest price for a stock for its sell price even though that was not the price at which Park sold. Park also reported gains when he actually suffered losses. The SEC includes other practices Park engaged in to inflate his performance. These allegations are sufficient to identify Park's misrepresentation; the SEC need not plead the facts that would show that the representations are indeed false. See Bankers Trust, 959 F.2d at 683. Thus, the SEC's claims are sufficient to meet the requirements of Rule 9(b).

## CONCLUSION

For the reasons set forth above, the Court denies Defendants' motion to dismiss.

Charles P. Kocoras
United States District Judge


Dated:    May 4, 2000